Filed 3/6/25  P. v. Lang CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C098530 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF22-00704) |
| v. | |
| LAURENCE DUANE LANG, | |
| Defendant and Appellant. | |

Defendant Laurence Duane Lang shot and killed the victim after the two had an argument.  At trial, Lang argued that he acted in the heat of passion and should only be convicted of voluntary manslaughter.  A jury rejected this theory and found him guilty of first degree murder.  The trial court imposed a life sentence without the possibility of parole.  Citing Penal Code section 1385, it stayed the sentences for several enhancements and a firearm possession conviction.[1]

---

[1] Undesignated statutory references are to the Penal Code.

1

On appeal, Lang asserts that he received ineffective assistance of counsel because his attorney did not request CALCRIM No. 522, a pinpoint instruction on provocation, and failed to object to a misstatement of law during the prosecution's closing argument. He also claims the trial court erred when it instructed the jury with CALCRIM No. 372, which permits jurors to consider a defendant's flight from the crime scene to show consciousness of guilt. Finally, Lang contends that the trial court should have stricken, rather than stayed, the enhancements and firearm possession conviction. We agree that section 1385 did not permit the trial court to stay, rather than strike or dismiss, the enhancements and conviction. We therefore remand the matter for resentencing. We otherwise affirm the judgment.

## BACKGROUND

The People charged Lang with one count of murder (§ 187, subd. (a); count one) and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count two). As to the murder count, the People alleged that Lang had a prior murder conviction (§ 190.2, subd. (a)(2)), served a prison term for that conviction (§ 190.05, subd. (a)), personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)), and had five prior serious felony convictions (§ 667, subd. (a)(1)). As to both counts, the People alleged that Lang had two or more prior strike convictions. (§§ 667, subd. (d), 1170.12, subd. (b).)

Before trial, Lang pleaded no contest to the firearm possession count and admitted the prior conviction and prison term allegations.

At trial, the jury heard testimony about the shooting, which occurred at an apartment complex. The manager for the complex testified that she was walking her dog on the evening of the shooting and saw Lang walking his dog nearby. From about 20 feet away, she observed Lang's dog urinate on a tenant's vehicle and asked him "if he believed that was right for his dog to do that because it's other people's property." The two got in a short argument, and she walked away.

2

The victim, a tenant in the complex, confronted Lang, saying he should not "talk to a woman like that." Lang and the victim were within a "couple of feet" of each other and began to argue, but the two were not loud enough for the manager to hear. Their argument continued for about five minutes. At least one person from a neighboring complex was nearby at the time.

After the argument, Lang walked away, and the manager spoke with the victim, telling him he "didn't need to step in." The victim told her he understood but did not think people should speak disrespectfully to others. He crossed the street, and the manager turned away. The manager then heard someone shout, "He's back, he's back," and another person said, "He's got a gun." Lang fired a handgun at the victim, and the victim fell to the ground. The manager hid and heard two more shots.

A resident of the apartment complex who witnessed the shooting testified that he was in his apartment when he heard a loud bang followed by another one or two bangs. He ran to his window and saw the victim lying in the grass in apparent pain. He saw Lang approach the victim with a gun, and the victim "waved his hands in a panic." The victim said, "no," three or four times, then Lang shot him two or three times. Lang said, "You are a bad ass now" and walked away.

Investigators found bullet casings on the asphalt and in the grass. They also collected video surveillance footage of the incident from multiple vantage points. The footage was compiled into one video that tracked Lang's movements and was played at trial.

The video showed a street view of Lang crossing the street with a dog, then cut to a different camera overlooking the scene of the eventual shooting at the apartment complex. The video did not capture Lang's argument with the victim but showed the victim returning to talk to the apartment manager after the encounter. It then cut to the initial street view, showing Lang walking back across the street with his dog, before

3

cutting back to the apartment complex for several minutes, and then back again to the street view.

Approximately three minutes after he last crossed the street with his dog, Lang walked back to the street, paused at the sidewalk for an oncoming car, then kept walking toward the apartment complex. The video then cut to the apartment complex and showed Lang walking toward the victim, who was backing away, and firing three shots before the victim fell into the grass. Lang walked over to the victim and fired three more shots. The crime scene investigator who assembled the video testified that approximately six or seven minutes passed between the initial confrontation between Lang and the victim and the shooting.

The parties stipulated that the victim was shot multiple times and died of the gunshot wounds. He had a blood alcohol concentration of 0.12 percent at the time of death and a tetrahydrocannabinol (THC) concentration indicating recent cannabis consumption.

The prosecution also admitted evidence of a phone call Lang made to his wife from jail. In the call, Lang said "his bullheadedness got the best of him," but there had been "a mob . . . coming after him." The mob had a "ringleader that wanted to fight him," so Lang "shot his ass." In another portion of the call, Lang said, "I did this, and I did it intentionally, I did it willingly too because I was mad and that dude came at me like a caveman and I could not take that. I couldn't, I couldn't just drop Mooky's leash and fight this dude." Lang's wife responded that she wished Lang had "stayed and talked to me" when he had come home. Lang stated, "The shit had put me over the top of boiling. I was already hot about . . . I know you would've talked me out of it, and I didn't, and I'm sorry."

Lang also admitted in a phone conversation that he had bullets in his nightstand that law enforcement had not discovered. Law enforcement then went to his home and found bullets of the same brand as the shell casings from the site of the shooting.

4

After deliberating for approximately one hour, the jury found Lang guilty of first degree murder and found true the firearm enhancement allegation.

At the sentencing hearing, the trial court sentenced Lang to life without the possibility of parole for the first degree murder conviction, explaining that it had no discretion "to impose anything other than" that sentence. The court also imposed a 25-years-to-life sentence for the firearm enhancement under section 12022.53, subdivision (d) but stayed it pursuant to section 1385, subdivision (b)(1). As to the prior serious felony enhancements under section 667, subdivision (a)(1), the court imposed five-year sentences, stayed pursuant to section 1385, subdivision (b)(1). The court imposed 72 months for the firearm possession conviction, stayed "in the interest of justice."

Lang filed a timely notice of appeal.

## DISCUSSION

## I.

Lang first contends that he received ineffective assistance of counsel because his attorney failed to ask the trial court to instruct the jury with CALCRIM No. 522, which allows jurors to reduce a murder conviction from first to second degree if the defendant was provoked. We reject Lang's contention.

## A.

The trial court instructed the jury on first degree murder using CALCRIM No. 521, stating: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the consideration for and against his choice, and knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death.

5

"The length of time the person spends considering to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not length of time. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the Defendant not guilty of first degree and the murder is second degree murder."

The jury also received CALCRIM No. 520, which instructed that murder was presumptively second degree murder unless the People established the above requirements.

The trial court additionally instructed the jury on heat of passion voluntary manslaughter using CALCRIM No. 570, which permitted the jury to convict Lang of voluntary manslaughter, rather than murder, if he "killed someone because of a sudden quarrel or in the heat of passion." Defense counsel argued in closing that the shooting happened as "the result of a sudden quarrel" and that Lang "was absolutely under the heat of passion when he acted."

Defense counsel did not request, and the trial court did not instruct the jury with, CALCRIM No. 522, which reads: "Provocation may reduce a murder from first degree to second degree . . . . The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

6

## B.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant " 'must satisfy a two-pronged showing:  that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 736; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687.)  "A 'reasonable probability' is one that is enough to undermine confidence in the outcome." (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington*, *supra*, at p. 697.)

"Provocation may indeed reduce murder from first to second degree." (*People v. Rivera* (2019) 7 Cal.5th 306, 328.)  " 'The evidentiary premise of a provocation defense is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 541.)  The provocation instruction is "relevant only to the extent it 'bears on the question' whether defendant premeditated and deliberated." (*People v. Rogers* (2006) 39 Cal.4th 826, 878.) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)  An "instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as . . . CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory. [Citation.]  The trial court is not required to give such an instruction sua sponte." (*People v. Rivera*, *supra*, at p. 328; see also *People v. Hernandez*, *supra*, at p. 1333.)

Lang argues that the result of the proceeding would have been different if the jury were instructed on provocation because, he maintains, it is likely that jurors would have found that the provocation of his argument with the victim was adequate to negate Lang's subjective deliberation and premeditation, even if it was objectively inadequate to reduce his conviction to voluntary manslaughter. As Lang acknowledges, however, there was no evidence presented about what was said during the argument between him and the victim. Thus, there was little basis on which the jury could have concluded that the incident would provoke a strong emotional reaction.

Conversely, there was significant evidence supporting the prosecution's theory that the murder was not rash or impulsive. The video evidence tracked Lang's movements and presented a clear timeline of the crime. More than five minutes elapsed between the time of the initial confrontation and the shooting, or enough time for Lang to walk his dog back home, retrieve his gun, walk back to the apartment complex, and shoot the victim. And even after the victim fell to the ground, Lang walked up and shot him again before walking away. In light of this compelling evidence of premeditation and deliberation, it is not reasonably probable that the outcome of the trial would have been different had defense counsel requested the provocation instruction.

## II.

Lang next asserts that the trial court erred when it instructed the jury that it could consider flight after the crime as evidence of his consciousness of guilt.

The trial court instructed the jury using CALCRIM No. 372, saying, "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning[] and importance of that conduct. However, evidence the defendant fled or tried to flee cannot prove guilt by itself." Defense counsel did not object to the instruction.

8

The trial court also instructed the jury using CALCRIM No. 200, which reads, in part, "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

Lang maintains that there was insufficient evidence that he fled the scene and that the flight instruction prejudiced the jury by allowing it to infer consciousness of guilt. As a threshold matter, we reject the People's argument that Lang failed to preserve these contentions by not objecting to the flight instruction at trial. Lang argues that the instruction affected his substantial rights, and his failure to object therefore does not forfeit the claim on appeal. (§ 1259; *People v. Cage* (2015) 62 Cal.4th 256, 285; *People v. Boyce* (2014) 59 Cal.4th 672, 691, fn. 12.)

When the prosecution introduces evidence that a defendant fled, " 'and if such evidence is relied on as tending to show guilt, then a flight instruction is proper.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 521-522.) Specifically, " '[a] flight instruction is proper whenever evidence of the circumstances of [a] defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge.' " (*Id.* at p. 522.) " ' " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.' " ' " (*People v. Leon* (2015) 61 Cal.4th 569, 607.) "Evidence that a defendant left the scene is not alone sufficient." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) There must be " 'substantial evidence of flight by the defendant . . . from which the jury could reasonably infer a consciousness of guilt.' " (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1245.) " 'The evidentiary basis for the flight instruction requires

sufficient, not uncontradicted, evidence.' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 499.) "A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We view the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)

We reject Lang's claim that use of the instruction violated his federal due process rights. In Lang's view, the instruction unconstitutionally allowed the "permissive inference" that he was conscious of his guilt simply because he "left the scene of the shooting and was driving his car afterwards." But as he acknowledges, our state Supreme Court has repeatedly rejected similar arguments. (*People v. Mendoza* (2000) 24 Cal.4th 130, 180, superseded by statute on another ground as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 62-63, fn. 8; see, e.g., *People v. Cage*, *supra*, 62 Cal.4th at p. 286; *People v. Boyce*, *supra*, 59 Cal.4th at p. 691; *People v. Loker* (2008) 44 Cal.4th 691, 706.)

We also reject a claim of state law error. Even if the instruction was erroneously given, there is no reasonable probability that Lang "would have fared any better" without it. (*People v. Pettigrew*, *supra*, 62 Cal.App.5th at p. 502; see *People v. Turner* (1990) 50 Cal.3d 668, 695; *People v. Watson* (1956) 46 Cal.2d 818, 836-837.) To begin with, the language of the jury instructions themselves minimized any prejudicial impact from the flight instruction. CALCRIM No. 372 does not assume that flight is established, instructing the jury that "*[i]f you conclude* that the defendant fled or tried to flee, it is up to you to decide the meaning[] and importance of that conduct." (Italics added.) Nothing in the language compelled a finding that Lang fled from the crime scene to avoid apprehension. In addition, the jury was instructed with CALCRIM No. 200 that "[s]ome of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts." Thus, the jury was informed that it had "to decide for itself" whether Lang's departure after the shooting "had any relevance when deciding guilt[,]

10

and . . . if it decided the evidence was irrelevant, it knew to disregard the flight instruction." (*People v. Pettigrew*, *supra*, at p. 502.)

At the same time, the evidence of Lang's guilt was strong. As explained above, the entire shooting was captured on video, and multiple witnesses identified Lang. There was also undisputed evidence that he was conscious of his guilt because he admitted killing the victim in a phone call with his wife. We thus see no reasonable probability of a better result had the challenged instruction not been given.

## III.

Lang next contends that he received ineffective assistance of counsel because his attorney did not object when the prosecutor misstated the law on heat of passion voluntary manslaughter by saying "words alone" are never sufficient to cause heat of passion. We reject this claim as well.

## A.

During his closing argument, the prosecutor discussed the heat of passion instruction, saying, "It can't be just anything; right? It has to be what you, the jury, decides is sufficient provocation. So the classic example is someone comes home and finds their spouse in bed with another person, and that provocation just sends them over the edge. Now the law says it doesn't have to be that, it can be anything that you decide is sufficient provocation. But bottom line is the defendant isn't allowed to make up his own standard of conduct to decide, well, disrespect, that's provocation. And it takes it out of murder down to voluntary manslaughter because I was so overcome with emotion. No. It has to be sufficient if it was a person of average disposition. In other words, a normal person, an average person facing the same provocation under the same situation would have been so overcome by emotion that they couldn't have reasoned, so the provocation must be sufficient.

"In this case, what do we know? We know someone told him you can't—take your dog somewhere else, don't let your dog pee on the car. Hey, don't talk to a woman

11

that way.  And then two men—fine.  Add a third in, [the neighboring tenant] is there, get in each other's face and have words.  That happens every day of the year, in this town, in every town in the world, a couple men having some words over something stupid.  Because this is over something stupid.  It happens every day.  I argue to you that is not, and never will be, sufficient provocation, no matter what was said.  And again, we don't have any evidence of what was said between them other than what I've just listed off.  Don't talk to a woman that way, don't let your dog pee on a car, take your dog someplace else.  We don't know what was said.  But no matter what was said, it looked like they might fight, and then they didn't.  If that is ever sufficient provocation for someone to be so overcome with emotion that they can't think, that they can't use reason, our world is in trouble."

Defense counsel did not object to any of the prosecutor's statements, but alluded to them in his own closing statement, saying, "The People say no matter what was said it doesn't justify what happened here.  Words are never enough.  Words can have a tremendous effect.  Words have started wars.  Words have started conflicts.  Words cut deep.  And the words that were said by multiple people in this incident to my client cut him to the core to the point where he could not control his actions."

B.

When a claim of prosecutorial error is based on the prosecutor's comments before the jury, the defendant must establish there is " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)  We do not look to isolated words or phrases, but rather "view the statements in the context of the argument as a whole." (*People v. Dennis*, *supra*, 17 Cal.4th at p. 522.)  "If the challenged comments, viewed in context, 'would have been taken by a juror to state or imply nothing

12

harmful, [then] they obviously cannot be deemed objectionable.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)  Similarly, "[i]f the challenged statements of the prosecutor during closing argument do not constitute prejudicial error, then defendant has not established ineffective assistance of counsel based on a failure to object to those challenged portions of the prosecutor's argument." (*People v. Lepere* (2023) 91 Cal.App.5th 727, 738-739.)

In a heat of passion case, the provocation that " 'incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.  [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-584.)  The provocation " 'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' " (*Id.* at pp. 585-586.)  Thus, " ' "[a] provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter." ' " (*People v. Najera* (2006) 138 Cal.App.4th 212, 226.)

Even assuming the prosecutor's statement was erroneous, there was no prejudice. In this case, the jury found Lang guilty of first degree murder, which means that jurors found that he acted willfully, deliberately, and with premeditation.  "[S]uch a 'state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates' " that Lang suffered no prejudice from any misstatements of law by the prosecutor concerning the degree of necessary provocation.  (*People v. Forrest* (2017) 7 Cal.App.5th 1074, 1086.)

Moreover, even on their own terms, the prosecutor's statements would not have led the jury to believe that verbal provocation could never be sufficient to show a defendant acted in the heat of passion.  The prosecutor expressly stated that provocation could "be anything that you decide is sufficient provocation."  Further, in context, the prosecutor's argument "that is not, and never will be, sufficient provocation, no matter what was said" specifically referred to the situation of two men having a commonplace disagreement "over something stupid."  The jury would likely have understood the prosecutor's statement to mean merely that a trivial argument should never provoke an average person to lose his or her reason and judgment, rather than that words in general can never do so.  In addition, the trial court instructed the jury on the proper standard for measuring provocation and told jurors, "You must follow the law as I explain it to you . . . .  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  In light of all these facts, Lang has not shown a reasonable probability that counsel's failure to object to the prosecutor's statement prejudiced the outcome of this case.

IV.

Finally, Lang contends that the trial court erred when it stayed the sentences for the firearm enhancement, the prior serious felony enhancements, and the firearm possession conviction because, under section 1385, it should have stricken the sentences rather than stayed them.

"Section 1385 provides that a court may, 'in furtherance of justice, order an action to be dismissed.'  [Citation.]  Though section 1385 literally authorizes the dismissal of 'an action,' it has been construed to permit the dismissal of parts of an action . . . ." (*People v. Tirado* (2022) 12 Cal.5th 688, 696.)  The "statute's application is broad: 'Section 1385 permits dismissals in the interest of justice in any situation where the Legislature has not clearly evidenced a contrary intent.' " (*Ibid.*)  As relevant here, the statute permits a trial court to dismiss firearm use enhancements (*ibid.*), prior serious

14

felony enhancements (*People v. Stamps* (2020) 9 Cal.5th 685, 700), and individual charges (*Wheeler v. Appellate Division of Superior Court* (2024) 15 Cal.5th 1193, 1208-1209).

A trial court " 'has no authority to stay an enhancement, rather than strike it—not, at least, when the only basis for doing either is its own discretionary sense of justice.' [Citations.] Rather, the only authority for staying an enhancement is California Rules of Court, rule 4.447, which applies when 'an enhancement that *otherwise* would have to be either imposed or stricken is barred by an overriding statutory prohibition. In that situation—and that situation only—the trial court can and should stay the enhancement.' " (*People v. Bay* (2019) 40 Cal.App.5th 126, 139.)

In this case, the trial court stayed the sentences for the enhancements under section 1385, subdivision (b)(1) and the sentence for the firearm possession conviction in the "interest of justice." Under section 1385, subdivision (b)(1), however, the trial court had the discretion to impose the enhancements, strike the enhancements, or strike the punishment attached to the enhancements; the statute does not provide the option to stay the sentences on the enhancements. Similarly, section 1385, subdivision (a) grants trial courts authority to *dismiss* an action or charge. Moreover, we disagree with the People's contention that, because Lang received a life sentence without the possibility of parole, rule 4.447 of the California Rules of Court allowed the trial court to stay the enhancements. The People cite, and we are aware of, no statute prohibiting the imposition of sentence enhancements simply because a defendant received a life without parole sentence. (See *People v. Bay*, *supra*, 40 Cal.App.5th at p. 139.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) A court that is not aware of the scope of its discretionary powers " 'can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' " (*Ibid.*)

15

"[W]hen a court has not exercised its informed discretion, remand is the default 'unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 431.)

Here, the record does not clearly indicate which of the options available under section 1385 the trial court would have selected. We therefore will remand for the court to exercise its discretion under section 1385 as to the enhancements and firearm possession conviction.

DISPOSITION

The sentence is reversed, and the matter is remanded for resentencing. The judgment is otherwise affirmed.

                                                 /s/

                                              FEINBERG, J.

We concur:

 /s/

ROBIE, Acting P. J.

 /s/

RENNER, J.